UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ELLA BOBULINSKI,

                    Plaintiff,

v.                                                    Case No.  5:04-cv-113-Oc-GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                    Defendant.
_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 7), and both parties have filed briefs outlining their respective positions. (Docs. 11 & 12.) For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on September 4, 1997, alleging a disability onset date of February 4, 1997 due to pain resulting from injuries in an automobile accident. (R. 20.) Plaintiff's application was denied initially and upon reconsideration. Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted Plaintiff's administrative hearing on October 16, 1998. (R. 347-367.) Plaintiff was represented by

Chris Bell throughout the course of the hearing. The ALJ issued a decision unfavorable to Plaintiff on February 1, 1999. (R. 235-245.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was granted and the Appeals Council remanded the case back to the ALJ on January 10, 2002. (R. 254-255.)

While the first claim was pending before the Appeals Council, Plaintiff filed a second application for a period of disability and disability insurance benefits on February 29, 2000, this time alleging a disability onset date of February 2, 1999. (R. 75-77.) Plaintiff's application was again denied initially and upon reconsideration. (R. 67-72.) Thereafter, Plaintiff once again timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an ALJ.

Both claims were presided over by a different ALJ at an administrative hearing dated March 7, 2002. (R. 368-381.) The ALJ entered a decision unfavorable to Plaintiff on April 1, 2002. (R. 19-29.) The Appeals Council denied Plaintiff's request for review on December 2, 2003, making the April 1, 2002 hearing decision the final decision of the Commissioner. On April 5, 2004, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II.  ISSUES PRESENTED

Plaintiff argues that the ALJ's decision to reject her testimony about disabling pain was not supported by substantial evidence, and was therefore erroneous. Similarly, she also argues that the ALJ erred by not according her testimony "a presumption of credibility."

Treating Plaintiff's arguments as one issue (*i.e.* whether the ALJ properly evaluated her testimony regarding pain), Defendant maintains that the ALJ justified his decision to reject Plaintiff's testimony about disabling pain by pointing to ample evidence of record and properly accorded little weight to the opinions of certain medical care providers upon which Plaintiff heavily relies in advancing her argument.

## III. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[1] *See* 42 U.S.C. § 405(g).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

4

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## IV. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was fifty-one (51) years old as of her last date of insured status on June 30, 2000. (R. 20 & 75.) She completed the 9th grade of education (R. 90), and has previous work experience as a convenience store cashier and manager. (R. 93-94.) Her work as a manager required Plaintiff to lift up to fifty (50) pounds, walk for two hours, stand for six hours, sit for thirty minutes and write, type, or handle small objects for two hours. (*Id.*) Plaintiff alleges that she stopped working due to headaches, neck pain, chest pain, back pain, arm pain, right knee pain, shoulder pain, arthritis, shortness of breath, depression, loss of balance, memory deficits, concentration deficits, high blood pressure, asthma, emphysema and dizziness. (R. 84.)

---

[18] <u>Walker</u> at 1003.

[19] <u>Wolfe</u> at 1077-78.

[20] *See* Id.

[21] *See* <u>Doughty</u> at 1278 n.2.

In his review of the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff does suffer from degenerative disc disease, be she does not have an impairment or combination of impairments which meet or medically equal one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. (R. 26.) Because this appeal concerns the ALJ's consideration of the effects of Plaintiff's pain on her ability to work, the Court focuses on those portions of the record concerning her allegations of disabling pain.

Plaintiff sustained multiple injuries in a motor vehicle accident which occurred on February 4, 1995. (R. 278.) B.J. Campbell, M.D., who examined Plaintiff at the hospital where she had been admitted following the accident, found fractures of the pubic rami inferior and superior on the right side[22] and a nasal fracture. (*Id.*) A complete body scan revealed slightly abnormal findings in the mid-sternum, left acetabulum,[23] and right pubic ischium. (R. 280.) X-ray films disclosed a cortical fracture of the sternum and a fracture of the right pubic ischium[24] and pubic ramus. (*Id.*)

Dr. R. L. Baker performed a neurological examination of Plaintiff on May 22, 1995. (R. 128-129.) He noted that after the accident, Plaintiff experienced pain in the neck, chest, and low back, as well as left arm radicular pain. (*Id.*) Baker also noted that Plaintiff's chief complaint was numbness and pain in her left hand -particularly the ring

---

[22] The two bony bars or extensions of the body of the pubic bone, the superior and inferior. The superior ramus enters into the formation of the acetabulum. *See* 5-R Attorneys' Dictionary of Medicine 501.

[23] The hemispheric or cup-shaped hollow in the side of the hip bone which receives the rounded upper end (the head) of the femur or thigh bone and with it forms the ball-and-socket joint of the hip, *i.e.*, the hip joint. *See* 1-A Attorneys' Dictionary of Medicine 1041.

[24] The lower back part of the hipbone, the part which supports the trunk in the sitting posture. There are two ischia, one under each buttock. *See* 3-I Attorneys' Dictionary of Medicine 4457.

and little fingers. (*Id.*) On examination, he found tenderness in Plaintiff's left elbow, and the remaining portion of the neurological examination was unremarkable. (*Id.*) Baker's impression was "cervical spondylitic discogenetic disease at C5-6 and C6-7, left worse than right." (*Id.*)

Two months after Plaintiff filed her original application for benefits, Stephanie Gonzalez, M.D., a neurologist, performed a consultative examination of Plaintiff on November 21, 1997. (R. 286-288.) Gonzalez noted that Plaintiff had a normal gait, and ambulated without assistance, and noted Plaintiff's report of the "onset of mid-sternal pain with reaching movements." (*Id.*) Her diagnostic impression was chronic cervical strain and myofascitis[25] with post-traumatic cephalalgia.[26]

Arthur Paraiso, M.D., treated Plaintiff from September of 1996 through April of 1998. (R. 134-142.) He initially noted Plaintiff's complaints of neck and back pain and "shaky legs." (R. 142.) He prescribed Ultram and, throughout the course of treatment, stated that Plaintiff's neck, back, and pelvic pain was getting progressively worse. (R. 134-141.)

Dr. R. W. Springstead, an orthopaedic surgeon, performed an orthopaedic disability examination of Plaintiff on February 23, 1998. (R. 310-311.) Plaintiff reported that she had pain in her neck, shoulders, upper and lower back, and down her leg. (*Id.*) She also stated that sometimes her elbows "feel like glass." (*Id.*) On examination, Springstead found that she could bend over with some pain in her lower back, had a full

---

[25] Inflammation of a muscle and/or the fascia which covers it. Also, inflammation of the fascia by which some muscles are attached to bone. *See* 4-M Attorneys' Dictionary of Medicine 7181.

[26] A pain in the head; the common headache. *See* 1-C-CG Attorneys' Dictionary of Medicine 3384.

8

range of motion in her hips and knees, and showed no sensory loss or weakness in her neck, upper extremities, back, or lower extremities. (*Id.*) Despite these findings, and after noting that he could not determine an exact diagnosis since he was without x-rays or other reports, Springstead gave an impression of "probable cervical spondylosis, chronic tendinitis [...and...] lower back syndrome." (*Id.*) Springstead concluded that Plaintiff "probably could not return to a job requiring a lot of heavy lifting or straining to the back or working overhead." (*Id.*) In a medical assessment of ability to do work-related activities, Springstead noted that Plaintiff could sit for 30 minutes at a time, sitting for no more than three hours in a workday; could lift only 5 pounds occasionally; and could stand for 1-2 hours at a time, standing for no more than 5 hours in a workday. (R. 312-313.)

In November 1999, Dr. Nidsa Martir performed a neurological examination of Plaintiff. (R. 220-222.) She found Plaintiff's motor strength, reflexes, and coordination to be 5/5 and normal. (*Id.*) Martir also noted moderate to severe musculoskeletal pain, and ordered a whole body bone scan and x-rays. (*Id.*) The bone scan revealed degenerative joint disease in the thoracolumbar spine,[27] shoulders, and costosternal[28] joint.

From December 1999 through December 2001, Plaintiff was treated by Miguel A. Gonzalez, M.D., a Rheumatologist and Board Certified Internal Medicine specialist. In an initial examination of Plaintiff, he noted that Plaintiff's chief complaint was neck and

---

[27] The part of the spine or vertebral column that extends through the chest and lumbar region, comprising the 12 thoracic vertebrae and the 5 lumbar vertebrae. *See* 5 Attorneys' Dictionary of Medicine 715.

[28] Pertaining to, or involving, the ribs and the sternum (breastbone). *See* 2-CH-CZ Attorneys' Dictionary of Medicine 6334.

shoulder pain for the past five years. (R. 206-207.) He found motor strength of 4/5 proximally and distally over the upper and lower extremities, and specifically stated that Plaintiff demonstrated "a total of 12 out of 18 tender points in the classic fibromyalgia syndrome distribution." (*Id.*) He gave a provisional diagnosis of cervicalgia, degenerative joint disease, lumbalgia with decreased disc space at L4-S1, fibromyalgia syndrome, chronic pain syndrome, polymyalgias, insomnia, depression, and right and left elbow pain with epicondylitis. (*Id.*)

Concerned about the possibility of cancer and/or hepatitis, Gonzalez immediately ordered bloodwork which ultimately ruled out such concerns. (R. 214-216.) A mammogram was also negative for any malignancy. (R. 212.) In January of 2000, Gonzalez noted Plaintiff's continued complaints of pain in her upper back, legs and hips. (R. 208.) During an examination on January 31, 2000, Plaintiff complained of right hip pain and aches from the knees down on both legs, and insomnia due to pain despite taking Ultram every six to eight hours. (R. 202-203.) Upon examination, Gonzalez found that Plaintiff exhibited 16 out of 18 fibromyalgia syndrome tender points, and increased muscle stiffness all over. (*Id.*) His assessment was polymyalgias, fatigue, and fibromyalgia syndrome. (R. 203.)

On April 8, 2000, Gonzalez performed a follow-up examination of Plaintiff. (R. 199-200.) He found that Plaintiff exhibited 18 out of 18 tender points and again gave an assessment of fibromyalgia and insomnia. (*Id.*) He also gave an assessment of hyperthyroidism. (*Id.*) Gonzalez saw Plaintiff again on June 12, 2000. (R. 198.) Plaintiff's chief complaint was head and neck pain and occipital pressure. (*Id.*) On examination, he found that Plaintiff exhibited 18 out of 18 tender points, and he again gave an

assessment of fatigue, fibromyalgia syndrome, tension headaches, and insomnia. (R. 197.) Gonzalez noted that Plaintiff was unable to work secondary to pain. (R. 198.) Examinations from June 2000 through December 2001 produced substantially similar assessments. (R. 191-196 & 226-231.)

A consultative psychological evaluation was conducted on July 24, 2000 by Hugh Brown, Ph.D. (R. 154-155.) Plaintiff arrived unaccompanied for the evaluation, having driven herself. (*Id.*) She complained of headaches and neck pain, and was "appropriately distressed about her pain status and limitations it [imposed] on her activities." (*Id.*) Brown gave a diagnosis of adjustment and pain disorders, gave a "guarded" prognosis, and stated that Plaintiff would be a "poor employment risk" due to her pain. (*Id.*)

There are two physical residual functional capacity ("RFC") assessments of record which were performed by non-examining state agency physicians. S. A. Goss, M.D., performed an assessment on July 1, 2000. (R. 146-153.) In view of the medical records, Goss stated that Plaintiff could lift up to 20 pounds occasionally, lift up to 10 pounds frequently, and stand, walk or sit about 6 hours in a workday. (*Id.*) Although he found some occasional postural limitations and limitations in the upper extremities due to fibromyalgia, neck and shoulder pain, Goss stated that Plaintiff is capable of performing restricted light work. (*Id.*)

James Green, M.D., another non-examining state agency physician, performed a second physical RFC assessment on November 13, 2000. (R. 183-190.) He also noted pain due to fibromyalgia, and agreed with Goss in stating that Plaintiff could lift up to 20

pounds occasionally, lift up to 10 pounds frequently, and stand, walk or sit about 6 hours in a workday. (*Id.*)

## V. <u>DISCUSSION</u>

### A. The ALJ erred by not providing adequate reasons to reject Plaintiff's testimony about debilitating pain

Pain is a non-exertional impairment.[29] Congress has determined that a claimant will not be considered disabled unless she furnishes medical and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.[30] Pain alone can be disabling, even when its existence is unsupported by objective evidence,[31] although an individual's statements regarding pain do not provide conclusive evidence of a disability.[32] The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[33]

An ALJ must apply the Eleventh Circuit's "pain standard" when, as here, a claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms.[34] In order to establish a disability based on testimony of pain and other symptoms, the pain standard requires: (1) evidence of an underlying medical

---

[29] <u>Foote</u>, 67 F.3d at 1559.

[30] 42 U.S.C. § 423(d)(5)(A).

[31] *See* <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992).

[32] 42 U.S.C. § 423(d)(5)(A).

[33] 20 C.F.R. § 404.1528.

[34] <u>Foote</u> at 1560.

condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[35]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[36] assessment to Plaintiff's complaints of pain. Although he did not cite the exact language of the standard, the ALJ's discussion and findings disclose that the standard was applied. Moreover, the ALJ articulated the same language regarding the subjective pain testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[37]

After applying the standard to the facts of this case, the ALJ determined that Plaintiff, indeed, met the standard. As to the first part of the pain standard, the ALJ found that Plaintiff suffered from disc disease - an underlying medical condition. (R. 25.) Further, although he did not find objective medical evidence confirming the severity of the alleged pain arising from the foregoing medical condition (the second part of the standard), the ALJ *did* find that Plaintiff satisfied the third part of the standard by providing evidence that her medical conditions were of such a severity that they could reasonably be expected to produce some limitations. However, the ALJ qualified this determination by referencing "clinical findings" and purportedly inconsistent complaints

---

[35] Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) *quoting* Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).

[36] Marbury at 839.

[37] *See* Wilson at 1226.

by Plaintiff to medical professionals which, in the ALJ's consideration, undermined her testimony during the hearing. (R. 24-25.)

Such findings, at the very least, imply that the pain standard was satisfied. This implication is made more obvious by the ALJ's subsequent evaluation of the credibility of Plaintiff's complaints of disabling pain - an evaluation which is jettisoned where the pain standard has not been met in the first place.[38]

With respect to Plaintiff's testimony about disabling pain during her period of insured status, the ALJ "[did] not find the claimant's testimony and complaints of record to be entirely credible." (R. 25.) The Eleventh Circuit has stated that where an ALJ discredits a claimant's testimony about subjective complaints, he must articulate explicit and adequate reasons for doing so,[39] or the record must be obvious as to the credibility finding.[40] While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[41] As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be

---

[38] *See* Marbury at 839 ("The Secretary must consider a claimant's subjective testimony of pain if he finds [that the pain standard is satisfied.]")

[39] Wilson at 1225.

[40] Foote at 1561-62;  Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[41] Foote at 1562-1563.

accepted as true.[42] A Court will not disturb a clearly articulated credibility finding supported by substantial evidence of record.[43]

Here, the Court finds that the ALJ failed to articulate adequate reasons to discredit Plaintiff's testimony about disabling pain. With respect to Plaintiff's testimony concerning her alleged back, neck, hip and leg pain, the ALJ stated that there was a lack of tests and reports supportive of Plaintiff's complaints, and that her testimony was inconsistent with her earlier complaints to various physicians of record. (R. 23-25.) In addition, the ALJ noted that "the claimant has been exaggerating her symptomatology which has been useful to her in swaying the thinking of several physicians." (R. 23.)

Such broad conclusions and unfounded conjectures defy those medical tests, examinations, and observations performed by numerous physicians of record - including treating physicians such as Drs. Miguel Gonzalez and Arthur Parasio - whose opinions on the nature and severity of a claimant's impairments must be given controlling weight if, as in this case, the opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with the other substantial evidence in the record.[44]

No less than six doctors of record documented Plaintiff's chronic neck, back, hip, and leg pain over a significant duration of time. Dr. Baker noted her complaints of back, chest, neck and arm pain during a May 1995 examination. (R. 128-129.) Dr. Paraiso,

---

[42] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[43] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[44] 20 C.F.R. § 404.1527(d)(2).

15

who treated Plaintiff from 1996 through 1998, documented Plaintiff's back, neck, and pelvic pain throughout the course of her treatment. (R. 134-142.) He also observed trembling and shaky legs. (R. 137 & 142.)[45] Dr. Springstead noted her complaints of neck, shoulder, elbow, back, and leg pain during a February 1998 examination. (R. 310-311.) Dr. Martir recorded severe musculoskeletal pain during a November 1999 examination. (R. 220-222.) Dr. Miguel Gonzalez, a rheumatologist who treated Plaintiff from December 1999 through 2001 (during and after her insured status), also noted Plaintiff's continuous neck, shoulder, back, hip and leg pain throughout the course of her treatment. (R. 191-216 & 226-231.) In light of the foregoing, it can hardly be said that Plaintiff has not consistently complained about or exhibited pain in her neck, back, hip and legs.

Furthermore, while the ALJ maintained that there are no tests or medical examinations of record which would support the extent of Plaintiff's alleged upper back, neck, and hip pain (R. 25), the record is replete with examinations and tests which *do* support the extent of such pain. In addition to those physical examinations and observations noted above, a complete body scan conducted shortly after Plaintiff's 1995 accident revealed slightly abnormal findings in the mid-sternum, left acetabulum (hip),[46] and right pubic ischium. (R. 280.) X-ray films disclosed a cortical fracture of the sternum

---

[45] This report contradicts the ALJ's bold statement that "no examinations of record have indicated shakiness in the claimant's legs." *See* R. 23.

[46] The hemispheric or cup-shaped hollow in the side of the hip bone which receives the rounded upper end (the head) of the femur or thigh bone and with it forms the ball-and-socket joint of the hip, *i.e.*, the hip joint. *See* 1-A Attorneys' Dictionary of Medicine 1041.

and a fracture of the right pubic ischium (lower back)[47] and pubic ramus. (*Id.*) After observing an MRI which revealed a bulge, and following treatment and examinations over the course of two years, Dr. Paraiso concluded that Plaintiff was suffering from fibromyalgia syndrome. (R. 135 & 137.) Further, a bone scan completed in 1999 revealed degenerative joint disease in the thoracolumbar spine, shoulders, and costosternal joint. (R. 220-222.)  Finally, examinations completed by Dr. Miguel Gonzalez revealed an increasing amount of tender points "in the classic fibromyalgia distribution" throughout the course of Plaintiff's treatment. (R. 191-216 & 226 - 231.) In light of the foregoing evidence of record, and in sharp contrast to the ALJ's assertions, it is obvious that there were indeed tests and medical examinations of record which would support the extent of Plaintiff's alleged back, neck, leg and hip pain.

It follows that although the ALJ "explicitly" articulated reasons to discredit Plaintiff's complaints of disabling pain during her insured status, those reasons are not supported by substantial evidence and therefore are not "adequate." Consequently, because the ALJ's decision to discredit Plaintiff's complaints of debilitating pain is not supported by substantial evidence, this matter is due to be remanded for the ALJ to reconsider the effects of Plaintiff's pain on her ability to perform basic work activities.

**B. The ALJ failed to accord appropriate weight to opinion of Dr. Gonzalez**

It is well established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is

---

[47] The lower back part of the hipbone, the part which supports the trunk in the sitting posture. There are two ischia, one under each buttock. *See* 3-I Attorneys' Dictionary of Medicine 4457.

shown to the contrary.[48] If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[49]

Conversely, an ALJ may discount or outright reject a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[50] Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[51]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; (6) other factors which

---

[48] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) Citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."); See Also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); See Also Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[49] 20 C.F.R. § 404.1527(d)(2).

[50] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[51] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); See also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

tend to support or contradict the opinion.[52] However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[53]

Upon review of the ALJ's decision, as well as an examination of the medical records at issue, the Court determines that the ALJ also erred by not according proper weight to the diagnoses, medical records, and opinions of Dr. Miguel Gonzalez - opinions upon which Plaintiff relies in arguing that she is disabled.

As mentioned earlier, Dr. Miguel Gonzalez is a rheumatologist who treated Plaintiff from December 1999 through 2001. Upon his evaluation of x-rays showing decreased disc space in the lumbar spine and MRIs revealing disc disease, he provided the provisional diagnosis of cervicalgia, degenerative joint disease, lumbalgia with decreased disc space at L4-S1, fibromyalgia syndrome, chronic pain syndrome, polymyalgias, insomnia, depression, and right and left elbow pain with epicondylitis. (R. 206-207.) After conducting several further tests and physical examinations, Gonzalez definitively diagnosed Plaintiff with fibromyalgia syndrome. Indeed, over the course of Plaintiff's treatment, he found her to exhibit from 12 of 18 to 18 of 18  tender points in the classic fibromyalgia syndrome distribution. (R.  191-197, 199-200, 202-203, 206 & 226-231.)

The ALJ gave little if any weight to the opinions of Dr. Gonzalez because the MRIs and x-rays upon which Gonzalez relied were not part of the record, and because Plaintiff's "neurological examinations remained essentially unremarkable." (R. 24.) This,

---

[52] 20 C.F.R. § 404.1527(d).

[53] Wilson v. Heckler, 734 F.2d 513, 518 (11th  Cir.1984); *See also* 20 C.F.R. § 404.1527(d)(2).

of course, is not good cause to reject the opinion. As the opinion offered by Gonzalez

on the nature and severity of Plaintiff's impairments is well-supported by "medically

acceptable clinical and laboratory diagnostic techniques," and is not inconsistent with

the other substantial evidence in the record, the ALJ erred by not according the opinion

proper weight.[54] Consequently, because the ALJ did not grant proper weight to the

opinions and diagnoses provided by Dr. Gonzalez, this matter is due to be remanded for

the ALJ to accord proper weight to the opinion in determining the effects of Plaintiff's

pain on her ability to perform basic work activities.

## VI. <u>CONCLUSION</u>

In view of the foregoing, it is hereby **ORDERED** that the decision of the

Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. §

405(g) to the Commissioner for the Administrative Law Judge to accord proper weight to

the opinion of Dr. Miguel Gonzalez, to reconsider the effects of Plaintiff's pain on her

ability to perform basic work activities, and to conduct any additional proceedings the

Commissioner deems appropriate. The Clerk is directed to enter final judgment and

close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on this 26th day of May, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel

---

[54] 20 C.F.R. § 404.1527(d)(2). The result does not change simply because the MRIs and x-rays upon which Gonzalez relied are not of record. The ALJ's interpretation of such tests, as opposed to the Doctor's interpretation, is of no import in the instant case.